(C. D. 1458)

## U. S. INDUSTRIAL CHEMICALS, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 28, 1952)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*John J. McDermott, William J. Vitale, Joseph E. Weil*, and *Mollie Strum*, special attorneys), for the defendant.

Before Cline, Ekwall, and Johnson, Judges; Cline, J., not participating

Ekwall, Judge: A quantity of blackstrap molasses imported in bulk for industrial use from the Dominican Republic and Cuba on the S. S. *Catahoula* was entered at the port of New Orleans. The molasses from the two countries was mixed together in the tanks of the importing vessel. It was necessarily unladen from the vessel in a mixed condition. The collector at New Orleans assessed duty upon the entire shipment at three one-hundredths of 1 cent per pound of total sugars under paragraph 502, Tariff Act of 1930, under the provision reading "Molasses not imported to be commercially used for the extraction of sugar or for human consumption."

In making this assessment, the collector applied the provisions of section 508 of the said tariff act reading as follows:

SEC. 508. COMMINGLING OF GOODS.

Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

Against the action of the collector in so assessing the highest rate of duty against the entire shipment of molasses, plaintiff filed timely protest claiming that the portion of said merchandise which was the product of Cuba was dutiable at only twelve one-thousandths of 1 cent per pound of total sugars under paragraph 502, Tariff Act of 1930, as modified by the exclusive trade agreement with Cuba, T. D. 51819, supplementary to the General Agreement on Tariffs and Trade, T. D. 51802, asserting said merchandise was not so commingled as to require the assessment of duty at the highest rate under section 508, Tariff Act of 1930; that the quantity and value of the Cuban molasses, as well as the Dominican molasses, could be readily ascertained by customs officers; and that section 508 did not apply to the imported merchandise.

Plaintiff conceded at the first hearing at New Orleans, La., on December 5, 1949, that the merchandise was properly classified by the collector as molasses not imported to be commercially used for the extraction of sugar or for human consumption. Plaintiff also conceded the accuracy of the weights as found by the Government weigher on customs Form 5985–B and the findings contained in the Government's laboratory report on customs Form 6415, report No. 3827/9, relating to this shipment, both documents being part of the official papers herein, which were moved in evidence as plaintiff's exhibit 1. It was stipulated into the record at the hearing that the

molasses covered by invoice No. 11606, dated November 26, 1948, as well as by invoice No. 11608, dated November 26, 1948, consisted of a product of Cuba; also, that the molasses covered by invoice No. 2156, dated November 19, 1948, consisted of a product of the Dominican Republic.

Mr. Harvey L. McLaughlin, of New Orleans, La., was called as a witness on behalf of the plaintiff at said hearing. He testified that he was the plant manager of the New Orleans plant of the U. S. Industrial Chemicals, Inc., the importer; that he had occupied said position for 3 years; that prior to such time, he was assistant plant manager, and, previously, supervisor of the Baltimore plant of the importer, and assistant plant manager at its Peoria, Ill., plant; that his total employment with plaintiff company had extended over a period of 27 years. He testified that as plant manager at New Orleans, he supervised all the operations which included the receipt of raw materials, such as molasses, and the converting of molasses into ethyl alcohol; that said ethyl alcohol was used for nonbeverage purposes, for all types of industrial purposes, including shellacs, paints, varnishes, pharmaceuticals, and everything except beverage purposes. He testified that he had supervised the importation of a number of bulk shipments of molasses. During 6 years prior thereto, these shipments of molasses had probably amounted to 12 ships a year, or a total of about 70 ships; that molasses had been received primarily from Cuba, Puerto Rico, Dominican Republic, and Mexico. He stated that in his experience there was always a certain amount of loss of molasses shipped in bulk from abroad to this country; in other words, a difference between the laden weights and those removed from the ships. Such difference would vary with different cargoes, and they would not object to a difference provided it was under 2½ per centum of the total cargo. Such losses were due to the fact that it was impossible to get all of the molasses out of a ship because of its viscosity, and that part of the molasses always adhered to the sides and bottoms of the ship's tanks. Also, a further cause of loss was due to differences in converting from pounds to gallons and gallons to pounds in the foreign country of origin and in this country. His attention was called by plaintiff's counsel to the inspector's report, contained in the official papers before the court, on the back of customs Form 7501–A, wherein it was indicated that there was a shortage from the invoice weights of this cargo of molasses amounting to 130,393 pounds. He was asked to state whether or not such a loss from the entire cargo of molasses was a normal loss, and he replied in the affirmative. He was further asked by counsel for plaintiff as to his familiarity with the process of manufacturing imported molasses by his company. He explained that molasses was received in bulk from tankers, transferred through pipe lines to storage tanks, from

there again transferred to vessels or tanks which are called fermenters, where it was diluted with water and yeast, and certain nutrients were added. Fermentation was then allowed to take place, wherein the sugar in the molasses was converted into ethyl alcohol. The mixture contained the ethyl alcohol and was transferred to distilling equipment where the ethyl alcohol was removed by distillation. All of such processing was done under his supervision. The mixing of molasses from different countries had no effect upon the molasses. The S. S. *Catahoula*, on which the instant merchandise was shipped, is owned by the Cuba Distilling Co., which is a wholly owned subsidiary of the U. S. Industrial Chemicals, Inc., plaintiff herein. On cross-examination by counsel for the defendant, this witness testified that he did not personally supervise the discharge of the cargoes of molasses from the ships but that he could tell by consulting the consular bills of lading or consular invoices from what country or countries the molasses had come. No further testimony was taken at this hearing, and the case was transferred to New York for the purpose of taking additional evidence.

On January 29, 1951, the hearing was resumed in the city of New York, at which time Captain Christian B. Simonsen was called as a witness on behalf of the plaintiff. He testified that he was master of the S. S. *Catahoula*, a tank vessel, and had been its master since 1947; that he had been a ship master since 1936. He carried liquid cargo on said vessel, mostly molasses, but at times a crude oil cargo. He explained that a tank vessel is a steamship that is specially built for carrying liquid cargoes; that it had an arrangement of tanks, subdivided, so that they are separate from each other; that there is a pump arrangement with pipe lines and pumps so that the cargo can be discharged out of the ship; that it is discharged through heavy hoses that are connected on what are called standpipes on deck which lead into the pump-room arrangement, and from the pump-room lines run into various tanks. The S. S. *Catahoula* is a liberty-type vessel with a capacity of 10,500 tons dead weight. The loading and unloading of a vessel of liquid, such as molasses or petroleum, are done under his supervision as master of the vessel. He testified that he was able to determine the quantity of liquid cargo that is loaded upon or unloaded from the S. S. *Catahoula* in the following manner: If the ship is loaded from shore tanks, the tanks are equipped with pneumercators, and before commencing the loading operation, a reading is taken of this pneumercator which gives the number of pounds in the tank of whatever the commodity is, and upon completion of the loading, another reading is taken of the pneumercator and the difference between the two readings is the number of pounds that have been loaded into the vessel. A draft reading of the vessel is taken before the loading begins. There is a scale on the fore and

aft ends of the vessel in feet and inches. The draft reading is made at both ends before and after loading has been completed, and the difference in the two readings gives the number of inches that have been loaded into the vessel, and they have scales from which they can tell how many tons per inch have been loaded, so that this process gives a very good check against the result of the pneumercator readings. The witness was shown a document entitled "Tank Log Sheet," which he identified as a record of the pneumercator readings in Barahona, Dominican Republic, and he verified his signature on the bottom right-hand corner of said document and another signature on the left-hand corner of the document as that of the factory superintendent of the seller of the Dominican Republic molasses. He further testified that this sheet indicated the quantity of molasses loaded upon the S. S. *Catahoula* at Barahona, Dominican Republic, as shown by the pneumercator readings at the time of the loading. The figure 7,538,562 on said sheet indicated the number of pounds of molasses in the tank on shore when loading operations were commenced at 10:50 a. m. on November 16, 1948. The figure of 561,437 in the same column indicated the amount that the pneumercator showed was left in the tank when the loading was completed at 4:45 a. m. on November 18, 1948. The figure of 6,977,125, contained in this column, was the difference between the two sets of figures heretofore mentioned and indicated the number of pounds of molasses loaded on board the S. S. *Catahoula*. He was asked what was meant by the term "brix" in this "Tank Log Sheet," and he testified that it is a measurement of the amount of sugar that is in the molasses but later qualified his answer by explaining that "brix" meant comparative weight, the viscosity weight; that it had a bearing on the measurement of sugar, but it was more of a viscosity measure. There were also some figures under the column head "Total Gallons of Liquid" which represented the quantity of gallons of molasses that was loaded on the vessel, which result was obtained by dividing the total of pounds of molasses by factor 12.332, and the result of such division indicated the number of gallons loaded. Said document was introduced as plaintiff's exhibit 3. He was then shown a document entitled "Cuba Distilling Company," report No. 175, which he said was a pneumercator certificate of the amount of the cargo which was loaded on his ship in Cienfuegos, Cuba, on or about November 25, 1948. He identified his signature on said document and also the signature of the plant manager, Jose Hidalgo, on the bottom of said sheet. He testified that this document indicated the quantity in pounds of molasses loaded in Cuba at said time aboard the S. S. *Catahoula*. He explained that the figures arrived at on the document were by the same procedure as outlined in the loading of molasses in Barahona, Dominican Republic. The pneumercator reading was taken prior to

loading being commenced and was taken again when the loading was completed, and the difference in the two readings of the pneumercator indicated the number of pounds of molasses loaded on the S. S. *Catahoula*; that the loading operation was from four different tanks in Cienfuegos, and readings were taken from each of these tanks; that the total pounds of molasses loaded was 8,920,513 pounds; that said number of pounds was converted into gallons on said report, using factor 12.151 pounds per gallon as a conversion figure; that the total number of gallons was 734,138. Said document was marked in evidence as plaintiff's exhibit 4.

This witness testified that he checked the draft readings before and after loading molasses at each port and that from these calculations he must have determined that these figures checked very closely with the pneumercator totals of pounds of cargo taken on board ship because he made no notation in the logbook as to any discrepancy between the draft readings and the pneumercator readings. He stated that a pneumercator gauge reading was made upon the unloading of the molasses at New Orleans under Government supervision. He was asked to explain the difference between the total quantity of molasses loaded in Cuba and the Dominican Republic as compared with the total cargo discharged at New Orleans. He stated that such losses ordinarily occur in transporting bulk cargoes in a tanker; that he had made 68 different voyages carrying such liquid cargo. He explained that the amount of loss depended somewhat upon the type of cargo and that even in different types of molasses they have sometimes had a heavier loss than at other times; that the lighter the cargo, the more readily it pumps out, and that you can strip it down cleaner than a heavier type molasses; that the same condition obtained as to lighter and heavier oil cargoes; that losses usually run from one-half of 1 per centum to 2 per centum and that such losses were ordinary; that the loss of molasses is attributable to the fact that part of such cargo remains or adheres to the sides of the tanks and that it is impossible to get it all out of the ship, even with steaming and applying of heat. He was asked as to whether loss of molasses was attributable to the conversion of pounds into gallons where the temperature varies, and he answered that the temperature is quite a factor in the difference of pounds into gallons. He was asked to explain why during the voyage the molasses from the Dominican Republic was mixed into the tanks containing the molasses from Cuba. He stated that when they were in Barahona, loading, he received orders from his company's office in San Pedro Demacrois that it had two lighters that the company wished towed from Demacrois to Cienfuegos for repairs and asked if he could undertake the tow, and he said that he could do it; that one was a steam lighter and the other had no power; that they went to Demacrois and took the

vessels in tow; that enroute to Cienfuegos, they had some heavy weather which caused a strain on the tow cable as the angle was too sharp from the stern of the ship to the lighter *Sampson*, so he ordered the molasses from some of the tanks that had been loaded at Barahona transferred to some of the tanks aft so as to reduce the angle on the tow cable. When they arrived in Cuba, they filled up the balance of the tanks with the Cuban molasses. He was asked whether the commingling occurred when they put the Cuban molasses in the same tanks with the Dominican Republic molasses, and he answered "That is right." He testified that according to his experience the quantity of molasses of Cuban origin and the quantity of molasses of Dominican Republic origin could be readily determined at the time when the commingled shipment was unloaded at New Orleans. He stated that whatever percentage of the total cargo was represented by Cuban molasses and Dominican Republic molasses would be the same percentage as it was discharged.

On cross-examination by Government counsel, the witness testified that the molasses loaded at Barahona, Dominican Republic, weighed slightly more per gallon than the molasses loaded in Cuba. He further stated that the heavier the molasses the more it would cling to the interior of the tank.

On redirect examination, he stated that when somewhat heavier and somewhat lighter molasses were mixed together, such as these two cargoes from Cuba and the Dominican Republic, then one would not adhere to the sides of the tank more than the other. He further stated on re-cross-examination that regardless of which tanks contained Cuban molasses and which tanks contained Dominican Republic molasses, and which contained the mixture at the time of arrival of the vessel at New Orleans, all of the cargo was drawn through one tank and discharged, so that it was all commingled at that time.

On January 30, 1951, at the resumption of hearing of this case in New York City, Mr. Vincent J. Farrell of New York was called as a witness on behalf of the plaintiff. He testified that he was senior accountant and assistant to the vice president, Mr. Regan of the Cuba Distilling Co.; that Mr. Regan was in charge of purchases of the Cuba Distilling Co. Mr. Farrell testified that he had been with the company since April 1941 and that his duties had been the same during all of that period of employment; that Cuba Distilling Co. is a wholly owned subsidiary of the U. S. Industrial Chemicals, Inc., and is the molasses purchasing division of the parent company. He testified that he was familiar with the purchase of the molasses covered by the three invoices involved herein; that he handled the forwarding of the analyses covering the intake of the cargo to the laboratory; that he made the payment for the merchandise, handled the contracts, and was perfectly familiar with the entire transaction; that he was

personally familiar with the methods used in the trade for determining the quantity of bulk molasses delivered to a purchaser; that he became familiar with this through experience and also through the handling of contracts covering such purchases which would indicate the procedure to be followed; that such methods are used almost one hundred percent in the trade and in practically all cases, except where pneumercator gauges were not allowed or were not available or the tanks were not equipped with pneumercator gauges, and in such cases they would use volumetric gauges which are gauges that indicate the cubic area of the tank and by the use of which they can determine the number of gallons extracted from the tank and can then reduce the gallons to pounds of molasses. He testified that according to his experience the method used in the trade to determine the quantity of bulk molasses delivered to a buyer is to accept the pneumercator measurement certificates and that such certificates are issued at the point of origin of the loading in the West Indies, that is, from the shore gauges; that if the point of delivery is at the foreign port, then the pneumercator guage certificates at the foreign port are used. He testified further that both the seller and the buyer signed the pneumercator gauge certificates showing their agreement as to the quantity of cargo delivered.

His attention was called to exhibit 3, and he pointed out that at the bottom of the certificate Captain Simonsen had signed as representative of the purchaser and the plant superintendent had signed as the representative of the seller, and he explained that the same procedure was followed so far as exhibit 4 was concerned. He further stated that the pneumercator readings in terms of pounds, as set forth in exhibits 3 and 4, constitute binding and final determinations of the quantity of molasses delivered by the sellers and received by the buyers; that according to his experience bills of lading, invoices, and other related shipping papers are always prepared on the basis of the pneumercator gauge determinations.

The witness was asked to state whether according to his experience there is a uniform and acceptable method used in the trade for determining the quantity and value of each portion of a commingled shipment of molasses, to which he answered "yes." He stated that he would have to take the pneumercator weight certificates covering the loading and the outturn weights in the States and prorate the intake percent to the outturn weight delivered in the United States. He was asked to produce a sheet of paper containing various figures, which was introduced as plaintiff's illustrative exhibit A. He testified that he had prepared this sheet, which indicated the method for determining the quantity and value of the respective portions of Dominican Republic and Cuban molasses and the excessive duties involved in the instant case, calculated thereon as $899.78.

On cross-examination, he said that his previous testimony as to the practice in the trade of accepting figures shown by the pneumercator at the place of lading was based upon his buying and selling molasses from other companies and handling the various contracts involved, which he found to be identical. He testified, however, that on certain purchases the contract called for delivered quantities in the States; in other words, that at times purchases were made f. o. b. West Indies and at other times delivered in the United States; that when it purchases molasses f. o. b. Dominican Republic, the natural loss in transit was absorbed by his company; that in every case, it was well known that there would be a loss between the intake and the outturn of the vessel. He testified that there was no way of determining definitely what proportion of the loss of the commingled molasses would be from that purchased in Cuba or from that purchased in the Dominican Republic, and that the only method that could be used was prorating the loss between the two cargoes.

On redirect examination, he testified that in a commingled cargo such as this, the loss, according to his experience, would be averaged over the entire cargo and that the slight difference in the brix of the two cargoes would not make a great deal of difference. He further testified on re-cross-examination that there were 10 tanks on the S. S. *Catahoula* and that it would have been possible to place the molasses from the Dominican Republic in 1 or 2 tanks, and it could have been kept entirely separate from the Cuban molasses.

The case was retransferred to New Orleans and at the resumption of the hearing there on March 8, 1951, Mr. William N. McAskill, the appraiser at New Orleans, La., was called as a witness by the plaintiff and testified that in each instance he accepted the invoice value covering each portion of this cargo as the correct appraised value.

Counsel for plaintiff contends that section 508 is not applicable where the quantities and values of the constituent items can be readily determined by the application of accepted trade practice or tests and cites a number of cases in support of this contention, the first of which is *United States* v. *Washburn-Crosby Co.*, 14 Ct. Cust. Appls. 243, T. D. 41874. The appellee in that case imported from Canada a quantity of wheat in bulk, which it entered as 107,248 bushels of wheat, under paragraph 729 of the Tariff Act of 1922, and 3,302 bushels of screenings, under paragraph 731 of said act. It was agreed that the wheat and screenings were mingled at the time of exportation, within the meaning of section 507, Tariff Act of 1922, which is the prototype of section 508, Tariff Act of 1930. The wheat and screenings were not segregated by the importer, and the collector thereupon classified the entire importation for duty as wheat at 30 cents per bushel under said paragraph 729. The importer protested, claiming the goods imported should have been classified as entered,

and, upon a hearing before the court below, its protest was, in effect, sustained, the judgment being that 2.7 per centum of the imported goods should be classified for duty as screenings under paragraph 731, and the balance thereof classified as wheat under paragraph 729, and a reliquidation was ordered accordingly, from which judgment the Government appealed.

It was contended and argued by the Government that when the appellee imported two commingled dutiable commodities, screenings and wheat, said section 507 imposed the mandatory duty upon it to segregate its importation into its constituent elements for duty purposes, within the period and in the manner fixed by that section, and that, having failed to do so, it must pay the higher rate upon the whole importation.

An inspector of grain for appellee testified that he took samples from each 300 bushels of the grain as it came from the ship, passed it over a device called a "kicker," which separates the wheat from the screenings, and from this comparatively simple operation was able to deduce and testify that 97.3 per centum of the importation was wheat and 2.7 per centum screenings. Another witness, who was the chief grain inspector and weighmaster of the Buffalo Corn Exchange, testified that he inspected 11 samples taken from this importation. These samples were taken by means of a probe or tube from each 300-bushel draft as it came from the ship to the elevator. This probe was plunged into the grain until it reached bottom; the compartments were then opened by means of a device at the top of the tube and grain was allowed to flow into each compartment, the compartments then being closed as they were opened, and the tube was then withdrawn. From the composite samples thus obtained, the final computation of wheat and screenings was obtained by this witness, and he testified that the amount of dockage or screenings so found by him was 2.3 per centum. The appellate court in this opinion stated:

* * * That the operation is a comparatively simple one is apparent in view of the testimony of Conners that on some days as many as 50 samples are taken and examined. That the results obtained are approximately correct must be assumed in view of the fact that the Department of Agriculture has approved and adopted this process. * * * The court below heard the witnesses testify and concluded that the approximate amount of screenings, as shown by the evidence, was 2.7 per centum.

The court therein held that from an examination of the record in the case at bar, the respective amounts of screenings and wheat in the importation in question were readily ascertainable by the customs officers and, this being true, it was the duty of the customs officers to so ascertain them and return the goods for duty accordingly, and the judgment of the lower court was affirmed.

The second case cited was *United States* v. *M. J. Brandenstein & Co.*, 17 C. C. P. A. (Customs) 480, T. D. 43941. In this case, milled rice, consisting of both whole and broken grains, was assessed for duty by the collector at the port of San Francisco at 2 cents per pound under paragraph 727 of the Tariff Act of 1922. The importer objected to the collector's assessment, claiming that while the whole grains of rice in the importation were properly assessed as milled rice at 2 cents per pound, the broken rice contained therein was properly dutiable as such at only one-half of 1 cent per pound under paragraph 727.

On the trial below the importer introduced the testimony of two witnesses, one a "licensed inspector" and the chief inspector of rice, wheat, corn, oats, and rye for the Chamber of Commerce of San Francisco. He testified that he had inspected rice for 20 years; that there are "two different grades of rice, the Hong Kong, China, and the Canton grades for foreign rice and then the U. S. Government grades of rice"; that milled rice is bought and sold according to grade; that, in order to determine the grade of a specific shipment of milled rice, it is necessary to ascertain the quantity of broken rice, "moisture, seed, paddy, and foreign material" contained therein; that the percentage by weight of broken rice can easily and readily be ascertained by putting a quantity of rice "through a mixer or divider" for the purpose of securing a representative small sample—30 grams—and then segregating the broken grains from the whole grains by hand, or, as stated by the witness, by "hand picking it"; that this method of ascertaining the quantity of broken rice in a shipment of milled rice is prescribed by the Government; and that he applied the described test to the official sample on the morning of the day he testified and found that the sample contained 88.4 per centum whole, 2.6 per centum "large broken," and 9 per centum "small broken" grains of rice.

The next witness testified to having used the same method employed by the previous witness and that he had obtained approximately the same results; that the method used was the usual and standard method for grading rice.

The Government placed three witnesses on the stand who testified principally as to the meaning of the term "milled rice" and to the fact that milled rice might contain broken rice in various amounts.

The court below sustained the protest, holding that the quantity of broken rice in the importation was readily ascertainable by the customs officials; that 91 per centum of the importation was dutiable as milled rice at 2 cents per pound under paragraph 727; and that 9 per centum was dutiable as broken rice under the same paragraph at one-half of 1 cent per pound.

There was a cross-appeal to the United States Court of Customs and Patent Appeals, the Government contending that the collector's

assessment was correct and should be sustained, and the importer claiming that the lower court should have held a larger percentage of this importation dutiable as broken rice.

The appellate court held that from the evidence the respective quantities of "milled rice" and "broken rice" in the importation in question were readily ascertainable by the customs officials. It further held from the evidence that the importation consisted of at least 10.1 per centum broken rice rather than 9 per centum as held by the court below. The judgment was modified to that extent.

The third case cited was *Perry, Ryer & Company* v. *United States*, 35 C. C. P. A. (Customs) 28, C. A. D. 367. This was an appeal from the judgment of the United States Customs Court sustaining the action of the collector of customs at the port of New York, who classified four respective shipments of goatskins imported from the Argentine as wool on skins of the common goat and hybrid goat commingled in the same bale under paragraph 1102 (b) of the Tariff Act of 1930 and assessed a duty thereon of 32 cents per pound of clean content, and overruling the protest of appellant claiming that the merchandise was nondutiable under paragraph 1688 or 1765 of the same act.

The court below held that section 508 of the Tariff Act of 1930, covering commingled goods, was applicable to the shipments here involved. There were four entries of the merchandise covered by appellant's protest and there is no dispute that each entry included two kinds of "Pampa" goatskins: (1) That of the common goat of the Argentine, entitled to free entry under paragraph 1765, and (2) that of the common goat cross-bred with the Angora, dutiable as hair of the Angora goat on the skin at 32 cents per pound of clean content under paragraph 1102 (b).

The record disclosed that the hair on the two kinds of goatskins was removed, cleaned, and baled, and then sold to a manufacturer for use in the production of wool carpets. The skins themselves were processed and sold for use as leather in the manufacture of shoes.

In the first entry, there were 30 bales, one of which was segregated and examined by customs officials, the report showing the bale contained 463 skins, 77 of which were taken from the hybrid goat and had a clean content of 25 per centum of hair of the Angora. The balance of the skins were taken from the common goat of the Argentine.

In the second entry, 3 bales were examined, and it was found that each such bale contained a different amount of dutiable skins, namely, 74, 65, and 75. In the third entry, 1 examined bale showed 72 Angora skins; and in the fourth, 72 Angora skins were disclosed in the 1 bale that was examined.

Following his examination of the bale covered by the first entry, the examiner made a memorandum on the invoice of purchase in which he stated, among other things, that he believed the bales covered by

the entry "to be uniformly packed." When the second entry came before him, however, the examiner, after completing the examination of the three designated bales, made another memorandum in which he advised the collector, among other things, that he, the examiner, was unable to definitely state whether the bales covered by the second entry were uniformly packed since the three examined bales "contained different amounts of dutiable skins."

The record disclosed that in liquidating the entry covering the first of the four shipments, the collector accepted the appraiser's report only as to the character and description of the merchandise and the advisory classification of the contents of the examined bale. The assessment was applied on a clean content of 25 per centum of the number of pounds of dutiable hair of the Angora on the skins in the examined bale at the rate of 32 cents per pound under paragraph 1102 (b). The skins of the common goat contained in the examined bale were held by the collector to be entitled to free entry under paragraph 1765. The credit allowed to the importer for the quantity of skins of the common goat of the Argentine contained in the examined bale of the first shipment was not allowed, however, for the examined bales of the last three shipments.

Assuming that the unexamined bales contained the same two classes of merchandise as the examined bales, the collector assessed duty on the estimated clean content of 25 per centum of the total weight of all the skins in all the bales of the second, third, and fourth entries at the rate of 32 cents per pound applicable to the hair of the Angora goat. The collector likewise applied the same assessment of duty to the 29 unexamined bales of the first entry.

In taking such action, the collector proceeded on the basis that the involved merchandise was so packed together or mingled that the quantity or value of each class of the merchandise contained in the imported bales could not be readily ascertained by the customs officers, and that the importer had not segregated the merchandise within 10 days after entry thereof in order to ascertain the quantity and value of each class as provided by section 508.

The opinion of the appellate court distinguished the facts of the case before it from those in the case of *S. Schapiro & Sons* v. *United States*, 29 C. C. P. A. (Customs) 235, C. A. D. 196, cited by the Government as controlling on the question there in issue. The *Schapiro* case, *supra*, involved 500 bundles of commingled rags of different classes, and the evidence showed that in order to accurately determine the quantities of the different classes it would have been necessary to open all of the bundles and sort the goods by hand, which would havebeen a very difficult, if not almost impossible, procedure. The court held that the facts of the *Schapiro* care and those of the

case there under consideration were readily distinguishable and that the *Schapiro* case was not a controlling authority on this question. The court held that it appeared that the two classes of goatskin merchandise were readily ascertainable upon the examination of the designated bales, and that the holding of the collector was erroneous and, therefore, constituted no legal basis for his action in the assessment of duty upon the skins that were entitled to free entry under paragraph 1765.

See also *Pacific Vegetable Oil Co.* v. *United States*, 64 Treas. Dec. 427, T. D. 46699; *W. C. Allen* v. *United States*, 69 Treas. Dec. 914, T. D. 48327; and *Schranz & Bieber Co., Inc.* v. *United States*, 1 Cust. Ct. 110, C. D. 30, cited.

Counsel for plaintiff in his brief herein further contends that the record shows that in the molasses trade there is an acceptable and usual trade practice for determining the respective quantities of a commingled molasses product as set forth in detail in illustrative exhibit A. The known respective quantities of each of the two original products are first set down; they are then reduced to percentage terms as applied to the known total quantity; these same percentage terms are then applied to the total known quantity landed, giving as a result the respective quantities of each of the two commingled products in terms of landed weights. This, counsel claims, established a practice the Government makes no attempt to attack or challenge in any way.

Counsel for the Government in its brief states as an analysis of the testimony in part as follows:

* * * that shortages on shipments of this kind are not uncommon due to the viscosity of the molasses which adheres to the sides and bottom of the ship and differences between gaugers in different countries; that the molasses from the Dominican Republic was a little heavier than the Cuban molasses and that the heavier the molasses the more it was apt to cling to the interior of the tank; that the brix (a hydrometer scale for expressing the specific gravity of liquids) percentage of total sugars and pounds per gallon of the Dominican Republic molasses were higher than that of the Cuban molasses; and that any part of the shrinkage could have been either of Cuban origin or of Dominican Republic origin.

Part of the brief is devoted to the question of the commingling of the molasses laden in Cuba and that laden in the Dominican Republic, but since this fact is not attacked by the plaintiff, it will not be necessary to go into this question in any detail.

Further in its brief, Government counsel, under the heading "Commingled Loss," stated in part as follows:

The record shows that there was a loss of 130,393 pounds during the ocean voyage from the two foreign ports to the United States. The witnesses have testified that they are not sure of the reasons for the loss, that it may be caused by the fact that it adheres to the sides and bottom of the ship and by the slight differences between the gaugers in the different countries; that they could not

ascertain which part of the loss was of Cuban origin or of Dominican Republic origin; that the Dominican Republic molasses weighs more per pound and would probably cling more to the interior of the tank, and therefore, the greater loss may have occurred in that shipment. However, the testimony is clear that whether the loss was caused by viscosity, temperature, density, conversion gauges affecting pounds and gallons, or other factors, the loss exists and nobody knows to which country of origin any portion of that loss is attributable, nor would it seem to matter since the Cuban shipment of molasses had already lost its identity when commingled with the Dominican Republic molasses.

\* \* \* \* \* \* \*

Further in its brief, Government counsel, under the heading of "Commingled Sugar Content," stated in part as follows:

The importer made a further attempt to establish that there is a trade practice for determining the respective quantities of the commingled molasses. The method which he attempts to prove by the testimony of Mr. Vincent J. Farrell, assistant to the vice president of the Cuba Distilling Company, a wholly owned subsidiary of the plaintiff importer, would be, at best, a rough estimate and pure guesswork. The plaintiff suggests that the percentages of the quantities of the two original products be applied to the total quantity which has been landed. Where it has been proven that the characteristics of the two products vary as to percentage of total sugars, brix, pounds per gallon, viscosity, density, and in other respects, and there is a likelihood of a greater loss of one type of molasses in transit, this attempt to pro rate the shipment on arrival according to the original percentages loaded would definitely be inaccurate.

Further in its brief, counsel stated as follows:

The rough practice of prorating a loss which cannot be accurately attributed to either of the commingled products bears no similarity to the scientific tests or standards prescribed by the Government or employed in a particular trade, for ascertaining the quantities or values of respective classes of merchandise, \* \* \*.

Counsel for the Government cited the case of *United States* v. *Ranlett and Stone*, 172 U. S. 133, decided by the Supreme Court of the United States in 1898, containing a general discussion of the law applying to commingling of merchandise as it then existed. However, this case does not seem to be of value in enlightening the court as to the law applicable to the facts of the instant case.

Counsel further cited the case of *United States* v. *E. E. Holler*, 28 C. C. P. A. (Customs) 124, C. A. D. 133, in which the court held that the customs officials were unable "readily" to ascertain and segregate portions of shipments of imported commingled fish for duty purposes. Perusal of this case indicates that appellee imported certain fish from Mexico and entered them at the port of Nogales, Ariz., on various dates ranging from November 6, 1936, to April 7, 1937. It was classified by the collector and assessed with duty under paragraph 717 (a), Tariff Act of 1930. It was claimed by the importer to be free of duty under paragraph 1730 (a) of the act. The record shows that some of the fish were caught directly from the vessel *Mabel*,

which had United States documentation; that the master of this vessel rented canoes belonging to Mexican nationals and employed fishermen who were Mexican nationals to fish from such canoes; that, in some instances, the *Mabel* towed the rented canoes to the fishing points in the Gulf of California, while in other instances, the canoes went out alone; that occasionally, "but not very often" the fish caught from such canoes were placed aboard the *Mabel* and carried to shore by the *Mabel*; that sometimes the canoes with their catch were towed by the *Mabel*, but frequently they went under their own power; that in whatever manner landed in Mexico, the fish were loaded into trucks and imported commingled, there being nothing in the condition of the imported fish from which the United States customs officials could distinguish as to quantities or classes. That as imported, the customs officials were unable to distinguish the fish caught directly from the *Mabel* from the other fish. It was held that while any fish caught directly from the *Mabel* and any caught from the canoes and carried to and placed upon the *Mabel* while it was at sea would be the product of American fisheries; that under the circumstances in that case, those caught from the canoes which went out under their own power and which returned to shore carrying their cargoes in the same manner, could not be so regarded; and that, since there was no compliance with the provision of section 508, Tariff Act of 1930, relative to segregation, none of the fish involved therein could be held free of duty. Since the record was devoid of any evidence showing which fish were the product of American fisheries and which were not, this set of facts is readily distinguishable from the facts in the case at bar.

Another case cited by Government counsel, that of *United States v. M. S. Cowen & Co.*, 32 C. C. P. A. (Customs) 40, C. A. D. 283, involved a shipment of 500 bags, totaling 50,000 pounds of shelled peanuts from the Philippine Islands, a portion of which (as stated by the Philippine exporter in the certificate of origin) consisted of peanuts from Java "to the value of fifteen (15) percent of the total value thereof."

The appellee made alternative claims. The two pertinent ones were alleged in the protest as follows:

The peanuts are free of duty under section 301 [Tariff Act of 1930]; or that portion of the peanuts which were of Philippine origin are free of duty under that section and section 508 [Tariff Act of 1930].

Section 301 provides in part:

* * * That all articles, the growth or product of or manufactured in the Philippine Islands from materials the growth or product of the Philippine Islands * * * which do not contain foreign materials to the value of more than 20 per centum of their total value * * * shall hereafter be admitted free of duty.

The trial court held, first, that the commodities therein involved were "articles" within the meaning of that term in section 301; second, that the shipment was far within the statutory requirement of products coming into the United States from the Philippine Islands containing no more than 20 per centum in value of foreign materials; and sustained the first claim in importer's protest, rendering judgment that the entire shipment was entitled to free entry under the first proviso in section 301.

In reversing the lower court, the United States Court of Customs and Patent Appeals ruled that the mixture of shelled Philippine peanuts and Java peanuts was not either the growth or product of the Philippine Islands or an article manufactured in the Philippine Islands from materials the growth or product of the Philippine Islands or of the United States, or of both, which did not contain foreign materials to the value of more than 20 per centum of their total value, and were, therefore, not entitled to free entry, stating that had the mixed shelled peanuts involved in that case been made into peanut butter in the Philippine Islands, such peanut butter, apparently, would have fallen within the scope of the language of section 301, and could have been imported duty-free.

The appellate court thereafter took up the question of the second contention in importer's protest to the effect that if it be held that the entire importation of peanuts was not entitled to free entry, such of the peanuts as were grown in the Philippine Islands were entitled to free entry, and passed upon this question *de novo* since this point was not decided by the trial court. The appellate court referred to certain evidence introduced at the trial to the effect that the importer caused samples to be taken from some of the bags and forwarded for examination to one Mr. Arthur Rudde, who was engaged in business as a peanut broker in San Francisco, Calif., commenting that the record, although somewhat hazy on the point, indicated that samples may have been taken from some 12 or 13 of the larger number of bags and that the samples were put in packages whose weight ranged from 2 to 5 pounds; that there was no definite showing of the time that the samples were taken from the bags. It appeared from Mr. Rudde's testimony that he probably examined five or six of the sample packages, but he made no written notes of the result of this examination and testified from memory. Among other things, he stated as follows:

The Philippine peanut is a little blunt peanut. It has a very light skin, whereas the Java peanut has a dark skin. The Philippine peanuts are round, somewhat like our Spanish peanut, whereas the Java peanut is more consistently with a blunt end. The Philippine peanut is not uniform in size, whereas the Java peanut is.

At another point, he stated:

The Philippine peanut is not as dark, the skin is not as dark, as the Java peanut. The Philippine peanut is brighter. It does not have as much oil and moisture content as the Java peanut has.

With respect to his method of segregating the peanuts, Mr. Rudde testified that he would have "to separate each peanut from the other," and, with respect to the time required for so segregating 5 pounds of peanuts, said: "I would say it would take 15 to 30 minutes." The appellate court observed that if it required at least 15 minutes to segregate the peanuts contained in a 5-pound sample, obviously it would require many hours to "separate each peanut from the other" in whatever quantity was necessary for a test in the large shipment of 50,000 pounds of shelled peanuts involved.

The court commented that appellee, the importer, contended that it was not necessary for customs officers to go through the entire importation peanut by peanut in order to ascertain the quantity or value of the respective classes, but that such could have been readily ascertained from an examination of small quantities drawn from the shipment as samples, citing as one of its authorities *United States* v. *M. J. Brandenstein & Co.*, 17 C. C. P. A. (Customs) 480, T. D. 43941, *supra*. The appellate court, in deciding the *Cowen* case, however, held that the decision in the *Brandenstein* case was not regarded as controlling since the facts of the two cases were not analogous, commenting that in the decision in the *Brandenstein* case it was held that the customs officials could have readily ascertained the quantity or value of the respective classes of rice upon the basis of samples of the mixture conforming with a test, or standard, prescribed by the Government and employed by the trade. On the other hand, it was pointed out by the appellate court that it was not shown in the *Cowen* case that the Government had any prescribed test, or standard, applicable to merchandise such as that there at bar, nor was it shown that any test, or standard, had ever been employed by the trade with respect to such merchandise, and upon the record presented, it was held that the court would not be justified in holding that the customs officers could have *readily* ascertained "the quantity or value of each class" of peanuts contained in the shipment, and, therefore, denied this alternative claim.

Defendant's brief herein, showing commendable zeal and exhaustive research, reviews a number of other questions, but we do not think detailed mention of them is necessary to a decision herein. From the record, we conclude that it was rather an exception and not the rule to commingle a cargo of molasses from two different countries as in the case at bar. There is evidence that part of the commingling, at least, was due to an unusual situation which arose at sea, while the

cargo vessel was towing two lighters, set forth in more detail, *supra*. In other words, no deliberate intent or purpose to mix these two types of molasses is attributed to the importer. Plaintiff's testimony reveals that an accurate gauge was made of the number of pounds of molasses taken on board the S. S. *Catahoula* in the Dominican Republic and also of the molasses taken on board in Cuba and that the loss or shrinkage of some 130,393 pounds of molasses noted when the cargo was unladen at New Orleans, La., was an expected one and apparently well below the average (being less than 1 per centum). The testimony reveals, further, that such a shrinkage in a commingled cargo in the molasses trade would be allocated percentagewise among the several commingled portions of the cargo, that it would be impossible to prove that the actual loss would be on a percentage basis, but that this method of calculation would be accepted in the trade. The Government did not introduce testimony refuting this and apparently accepted it at its face value. It goes without saying that the two different portions of the cargo of molasses in controversy herein could not have been physically separated after being commingled. The law does not exact the impossible and neither does it demand a quality of proof beyond peradventure of doubt. We are of the opinion that section 508, Tariff Act of 1930, must be construed and applied in the light of reason and experience. The provision "whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise *can not be readily ascertained* by the customs officers, * * *" [italics ours] was undoubtedly enacted to protect the revenue of the United States and to insure that the customs officers would not be required to go to unreasonable lengths to perform their duties as such. But here we have documentary evidence of the number of pounds of molasses laden on board ship in the Dominican Republic and also that laden on board ship in Cuba. The method suggested by plaintiff's witness of prorating the shrinkage percentagewise to both portions of the cargo seems reasonable and fair to both the importer and the Government. Application of this method would seem to do justice to the importer without doing violence to the revenue of the United States. True, it is not an infallible method but neither was the sampling method approved in the *Washburn-Crosby Co.* case, *supra*, a perfect one. The appellate court did not hold in that case that the customs officers must physically separate all the grain from the screenings nor did the court require the importer to do so. It merely approved the method of estimating the percentage of grain and the percentage of screenings by use of the "kicker" device outlined therein. Again in the *Brandenstein* case, *supra*, the appellate court did not cast the onus on the

importer of hand-picking the broken particles of rice from the whole grain in order to gain the privilege of obtaining the lower rate of duty on the portion of the shipment consisting of broken rice. It approved the reasonable method outlined by the witness of estimating the different types of rice in the shipment. The fact that this testing method was prescribed by the Government did not make it sacrosanct. The method used was the usual and standard method. We may say, in passing, that in the Government brief, quoted, *supra*, such testing methods are referred to as "scientific tests or standards" but an analysis of them will inevitably disclose that they are not infallible and, in fact, necessarily leave room for a considerable margin of error. Being apparently the best methods so far devised, they are accepted and employed by the Government and by the various trades whenever practicable.

In the *Perry, Ryer & Company* case, *supra*, the appellate court did not hold that either the importer or the customs officers must physically separate the skins of the hybrid goats from those of the common goats but held, in effect, that the result of the examiner's segregation of the skins in the 1 bale of the first entry of 30 bales could be applied to all the bales of all the entries therein and reversed the lower court's holding in favor of the Government. Surely, no one can say that an estimate of the number of hybrid skins in each bale, based upon the examination of one bale out of many, could be accepted without admitting there was some element of chance or doubt of its correctness, but again the appellate court adhered to a rule of reason, and not to one of exactitude.

We have pointed out that in the *E. E. Holler* case, *supra*, dutiable and nondutiable fish were so commingled that no one could separate or estimate one type from the other. No evidence was introduced attempting to show which portion or quantity was nondutiable, and the appellate court very properly held that the provisions of section 508, Tariff Act of 1930, applied.

In the *M. S. Cowen & Co.* case, *supra*, no competent evidence was introduced to prove the percentage of Java shelled peanuts which were commingled with those grown in the Philippine Islands. The customs officers would have had to resort to the medium of speculation or conjecture in order to have allowed plaintiff's claim that an estimate of each type of peanut could have been made. Such a claim should have been bottomed on evidence which would have shown reasonable accuracy and a testing method approved by the Government or used in the trade. The testimony of Mr. Arthur Rudde as to the sampling done by him in that case, while entitled to full credit, fell far short of meeting ordinary standards of proof. The samplings were of only a few of the large number of bags of shelled peanuts and no record was

kept by Mr. Rudde, and he apparently testified the best he could from memory. The method used by him on the few samples of peanuts taken was slow and tedious. (He testified that it took him from 15 to 30 minutes to hand-separate a 5-pound sample.) Obviously, it would have been unreasonable to expect the customs officials to endeavor to ascertain the amount of the different types of peanuts in that shipment. Hence, the alternative claim of appellee therein was denied.

After a careful review of all of the facts of the instant case and the law applicable thereto, we hold that the provisions of section 508, Tariff Act of 1930, do not apply herein; that the respective amounts of molasses from the Dominican Republic and that from Cuba could have been readily ascertained by the customs officers when landed at the port of New Orleans by utilizing the documents available and the methods outlined in the testimony. Section 508, it is true, requires the customs officials to exercise certain discretion and judgment when merchandise comes under their observation in a commingled condition. However, such discretion is to be exercised in such a manner, if reasonably possible, as will preserve the rights of the importer and yet protect the revenue of the United States. The decision of the collector of customs at New Orleans will be reversed and the protest herein sustained. Judgment will be entered accordingly.